**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| RICARDO SANTACRUZ-BECERILL, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

2:09-cr-00466-PMP-LRL

MOTION TO SUPPRESS (#72)
MOTION TO SUPPRESS (#75)
MOTION FOR JOINDER (#79)

# REPORT & RECOMMENDATION

Before the court are defendant Luis Sagrero-Alba's Motion to Suppress (#72), defendant Manuel Gudino-Sierra's Motion to Suppress (#75), and defendant Hector Gonzalez-Alba's Motion for Joinder to Defendant Gudino-Serra's Motion to Suppress (#79), which the court treats as a motion to suppress. The government filed an Opposition (#77) to motions (#72) and (#75); and an Opposition (#82) and Revised Opposition (#91) in response to Gonzalez's motion (#79). Sagrero filed a Reply (#81) and Gonzales a Reply (#85). Each defendant contends that his post-*Miranda* statements must be suppressed because his lack of English speaking proficiency compromised his ability to understand and then voluntarily, intelligently, and knowingly waive his Fifth Amendment rights.

### BACKGROUND

An evidentiary hearing was conducted on March 16, 2011. The government called as witnesses Officer Juan Guzman of the Las Vegas Metropolitan Police Department ("Metro"); Metro Det. Michael McIlroy; and Metro Det. Cesar Cedano. Based on the testimony adduced at the evidentiary hearing and the exhibits attached to the parties' papers, the court finds the following facts have been established by a preponderance of the evidence.

On the evening of October 18, 2009, the defendants were arrested on methamphetamine drug trafficking charges following a buy-bust in the parking lot of the Boulder Station Hotel and Casino in Las Vegas, Nevada.  Metro detectives did not expect to make any arrests that evening.  Rather, Det. Cedano, acting in an undercover capacity, and a confidential informant intended to meet with defendant, Ricardo Santacruz-Becerill, to buy a sample of methamphetamine.  As it happened, Santacruz indicated that he had arrived at the Boulder Station ready to sell a pound of methamphetamine for $18,500. Santacruz led Cedano and the CI to a black Ford Explorer parked in the lot.  Gonzalez was in the driver seat of the Explorer, and Sagrero was in the passenger seat.  Santacruz indicated that Cedano and the CI were with him.  The defendants asked to see the money, but Cedano and the CI advised that they needed to see the drugs first.  Santacruz indicated that the methamphetamine was located nearby in a green minivan containing two other men.  The driver was identified as Gudino and the passenger as Saloman Barajas, who is not a defendant in this case.  One of the defendants instructed Cedano to retrieve the money, while Santacruz and Sagrero led the CI to the green van.  Gonzalez stayed in the Explorer.  After the CI viewed the drugs, he contacted Cedano, and patrol cars arrived shortly thereafter.

As the patrol cars entered the parking lot, Santacruz, Sagrero, Gudino and Barajas started to walk away from the van but were detained by patrol officers.  Det. McIlroy, who was conducting surveillance, saw Gonzalez exit the Ford Explorer and walk toward the casino.  He detained Gonzalez and led him back to the other suspects by the patrol cars.  McIlroy approached the green minivan; looking through the side window he saw a .22 caliber handgun on the floor of the van.  The sliding door was ajar, so he slid it open to check the immediate area surrounding the gun.  On the floorboard between the front seats, McIlroy observed a package wrapped in plastic.  He cut open the package and saw a large quantity of white crystalline substance consistent with methamphetamine.  McIlroy placed all five suspects under arrest.  After ascertaining that several of the suspects spoke Spanish, he called for a translator to come to the scene to Mirandize them and aid him in questioning.

Officer Guzman, who had been certified by Metro in June or July of 2009 to act as a translator, arrived on the scene about a half-hour later to assist McIlroy.  Four of the suspects were standing

handcuffed near the patrol vehicles.  McIlroy and Guzman followed the same sequence to question each man individually: Guzman greeted the suspect to be questioned in Spanish and received an appropriate response in Spanish from each.  The two officers then lead the suspect to an area about two rows of parked cars away from the group that was lit by the parking lot lights.  Guzman read, *verbatim*, Metro's Spanish *Miranda* rights card to the suspect.  The English and Spanish cards are identical.  The card, translated to English, reads:

> You have the right to remain silent.  Anything you say can be used against you in a court of law. You have the right to the presence of an attorney.  If you cannot afford an attorney, one will be appointed for you for questioning. Do you understand these rights?[1]

After receiving the warnings, and in response to the question "do you understand these rights," each suspect answered "Si."  None indicated that he did not understand the *Miranda* warning or otherwise expressed confusion. Guzman then told McIlroy that the suspect understood his rights and was willing to answer questions.  McIlroy proceeded to question the suspect, with Guzman translating his questions from English to Spanish and the suspect's responses from Spanish to English.  At times Guzman asked clarifying questions in Spanish then relayed the answer in English to McIlroy. Guzman was dressed in his Metro uniform, and McIlroy was dressed in plain clothes.  Neither officer had his weapon drawn.  Both testified that the tone of the questioning was laid back and conversational.

The officers spoke with Gonzalez first.  Gonzalez told them he was at the casino that night to gamble.  When asked why he was sitting in the Explorer with the engine running, he said he was waiting for his cousin, Sagrero, to return.  The officers asked if there was anything illegal in the vehicle. Gonzalez said no and said they could search the vehicle. The officers advised him that he didn't have to let them in the vehicle, but Gonzalez again said they could check it.  McIlroy and Sgt. McGrath searched the vehicle, after which Guzman and McIlroy returned Gonzalez to the group and walked Santacruz to the same place they had questioned Gonzalez.

When asked why he was in the parking lot, Santacruz had no response.  When asked how he got

---

[1]  These are the *Miranda* warnings that Metro used at the time of the arrest in October, 2009.  The text on the card has since been changed.

3

there, he said he arrived with his friend, Carlos, in a white Kia. Guzman told him that the officers knew he was there to arrange a deal of one pound of methamphetamine. Santacruz said if they knew that already then he had nothing else to say. The officers escorted him back to the patrol car and pulled Sagrero away to be interviewed.

Guzman asked Sagrero what he was doing at the Boulder Station. Sagrero said he'd arrived with Gonzalez and Santacruz. Guzman asked if he knew about the drugs and gun found in the green van. Sagrero said he didn't know any thing about it and it wasn't his problem. As to why Gonzalez had been sitting in the Explorer with the engine running, Sagrero said he didn't know. Guzman and McIlroy escorted Sagrero back to the patrol car and took Gudino for questioning. Gudino admitted that the green van he had arrived in was his. He also stated that the methamphetamine and the gun were his, but he wasn't planning on selling the methamphetamine. Gudino said that Barajas was his passenger but he didn't think Barajas knew about the drugs or gun.

The officers questioned Barajas. He indicated that he didn't know about the methamphetamine until he saw Gudino show it to Santacruz. He also told the officers that he saw Sagrero throw the gun into the van when the patrol cars pulled in. Guzman and McIlroy re-interviewed Sagrero. When asked if there was any reason the gun would have his fingerprints on it, Sagrero said yes, but the gun was not his; he had borrowed it from his friend, Marcos, for protection. He admitted that he had agreed to help Santacruz for $500.

Gonzalez was the next to be re-interviewed. When told that his story wasn't matching the other stories, he admitted he knew Santacruz was there to broker the sale of a pound of methamphetamine for $18,500. Gonzalez expected to be paid $200 to sit in the Explorer with the engine running. He also told the officers he had accompanied Sagrero to a Food4Less so that Sagrero could borrow a gun from Marcos. The officers returned Gonzalez and spoke with Santacruz. When told that his story wasn't matching other stories and that officers knew he was there to broker a sale of methamphetamine, Santacruz admitted that he was brokering the deal. He also stated that he had bought methamphetamine from Gudino in the past and had brokered sales for Gudino. Questioning ended, and the defendants

were transported to jail. Sagrero, Gonzalez, and Gudino each seek suppression of his statements on the ground that he did not knowingly, intelligently, and voluntarily waive his right to silence, because as a native Spanish speaker, he did not understand the *Miranda* warnings.

### DISCUSSION

The Fifth Amendment requires suppression of statements made during a custodial interrogation unless the defendant has been apprised of, and validly waives, his rights to silence and the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436 (1966). For a waiver to be effective, it must be made knowingly and voluntarily. *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986). The Ninth Circuit uses a totality of the circumstances test to determine whether a defendant knowingly and voluntarily waived his *Miranda* rights. *United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998). Specifically, the Ninth Circuit considers the following factors:

> (1) whether the defendant signed a written waiver; (2) whether the defendant was advised of his rights in his native tongue; (3) whether the defendant appeared to understand his rights; (4) whether a defendant had the assistance of a translator; (5) whether the defendant's rights were individually and repeatedly explained to him; and (6) whether the defendant had prior experience with the criminal justice system.

*United States v. Garibay*, 143 F.3d at 538 (internal citations omitted). The government bears the burden of proving by a preponderance of the evidence that a defendant knowingly and intelligently waived his *Miranda* rights. *Id.* at 537 (citing *Colorado v. Connelly*, 479 U.S. at 168).

Having considered the above factors and the evidence, the court finds that the government has met its burden of proving that each defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights before making inculpatory statements to Guzman and McIlroy. While a written waiver in particular is strong evidence that the waiver was valid, *Derrick v. Peterson*, 924 F.2d 813, 824 (9th Cir. 1990), "a police officer need neither use a waiver form nor ask explicitly whether the defendant intends to waive his rights" for a waiver to be valid. *United States v. Cazares*, 121 F.3d 1241, 1244 (9th Cir.1997) (citing *Terrovona v. Kincheloe*, 912 F.2d 1176, 1179 (9th Cir. 1990)); *see also United States v. Younger*, 398 F.3d 1179, 1185-86, 1186 n.5 (9th Cir. 2005) (although an officer's decision to forego reading of express waiver language and/or request an express waiver, "while lawful resulted in

unnecessary time and effort and a waste of judicial resources") (internal quotations omitted).  Rather, an implicit waiver of the right to remain silent is sufficient to admit an accused's statements into evidence.  *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2261 (2010) (citing *North Carolina v. Butler*, 441 U.S. 369, 376 (1979)).  "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  *Berghuis v. Thompkins*, 130 S.Ct. at 2261; *see also Miranda*, 384 U.S. at 475; *Colorado v. Spring*, 479 U.S. 564, 573-75 (1987) (defendant must understand rights to validly waive them); *Connecticut v. Barrett*, 479 U.S. 523, 530 (1987) (defendant's ignorance of the full consequences of his decision to waive his rights does not vitiate voluntariness of the waiver where he testified that he fully understood the *Miranda* warnings given to him).

Here, each defendant was informed of his rights in his native tongue, Spanish, by a native Spanish speaker.  Each indicated he understood his rights, then made uncoerced statements with the assistance of a translator who is fluent in Spanish.  The evidence further indicates that no defendant had difficulty understanding Guzman's Spanish translation of McIlroy's questions.  Rather, over two rounds of questioning, each provided statements that were appropriately responsive to the officers' questions. *See e.g. United States v. Ramirez-Lopez*, 315 F.3d 1143, 1149-50 (9th. Cir. 2003) (upholding Spanish-speaking defendant's waiver as knowing, intelligent, and voluntary despite his lack of education where the government had a fluent Spanish-speaking agent interviewing him, and he was responsive and understood the questions asked of him).

Although none of the defendants is alleged to have an extensive criminal history in the United States, there is no evidence that any defendant was confused about, or lacked the capacity to understand, the process.  *See Garibay*, 143 F.3d at 538, 539 (waiver invalid where, among other things, defendant whose "IQ is borderline retarded" and who had "no previous experience with the criminal process" was unfamiliar with the *Miranda* rights and his option to waive those rights) (citing *Cooper v. Griffith*, 455 F.2d 1142, 1144-45 (5th Cir. 1972) (holding that in view of armed robbery defendants' mental retardation, poor reading comprehension, and no prior experience with the criminal process, confessions

6

obtained after defendants orally waived right to counsel and signed written waiver forms were inadmissable)).  Rather, Guzman testified that none of the defendants seemed confused as he read the card; nor did any defendant ask him for clarification as to the meaning of the rights, such that the rights needed to be repeatedly explained in greater detail. *See Derrick*, 924 F.2d at 824 (finding defendant's waiver of *Miranda* rights knowing and voluntary, notwithstanding his youth and his low mental capacity, where he was read or informed of his rights at least four times, and waived those rights either orally or in writing each time).  Had they appeared confused or asked for clarification, Guzman testified he would have inquired as to what they didn't understand and then explained it to them as he had in other situations. Finally, the uncontroverted evidence demonstrates a clear absence of any type of coercive or threatening behavior on the part of the officers.

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Luis Sagrero-Alba's Motion to Suppress (#72), Manuel Gudino-Sierra's Motion to Suppress (#75) and Hector Gonzalez-Alba's Motion for Joinder (#79) should be denied.

DATED this 4th day of April, 2011.

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**

7